FILED
2010 Aug-27 PM 05:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

**JIM BURKE AUTOMOTIVE, INC.,**
**dba JIM BURKE JAGUAR,**

Plaintiff,

vs

CASE NO. CV-10-B-2207-S

**JAGUAR LAND ROVER NORTH**
**AMERICA, LLC,**

Defendant.

### DECLARATION OF MICHAEL COLEMAN IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

I, Michael Coleman, declare:

1. I am employed by defendant Jaguar Land Rover North America, LLC ("Jaguar" or "JLRNA") as a Franchise Development Manager. My job responsibilities include, among other things, overseeing the processing and evaluation of various proposals from Jaguar dealers, including proposals by dealers to relocate their facilities. My area of responsibility includes Alabama. I have personal knowledge of the facts stated herein.

### Background

2. Plaintiff Jim Burke Automotive, Inc. dba Jim Burke Jaguar ("Burke") and JLRNA are parties to an agreement pursuant to which Burke is authorized to act as a Jaguar dealer (the "Agreement"). Burke has annexed a copy of the Agreement to its Complaint as Exhibit B. The Agreement consists of a "Replacement Dealer Agreement," dated May 12, 2008, pursuant to which JLRNA became the franchisor, replacing the Jaguar Cars Division of the Ford Motor

Company, and which incorporates by reference the three documents: (i) a "Dealer Agreement" dated November 12, 1991, pursuant to which Burke was originally appointed; (ii) the "Dealer Agreement Standard Provisions" (the "Standard Provisions") which are incorporated into the Dealer Agreement and which set forth the basic provisions governing the parties' relationship; and (iii) a Performance Agreement dated July 11, 2001 (the "Performance Agreement"), which supplements and amends the Dealer Agreement and Standard Provisions.

3.  The Performance Agreement sets forth, among other things, the current agreement between Burke and Jaguar concerning Burke's authorized Jaguar facility. It establishes 2415 7th Avenue South in Birmingham, Alabama as the authorized location for Burke's Jaguar dealership.

## The Agreement Concerning Facilities

4.  Having facilities that are attractive, properly-branded, and of appropriate size is especially important to a luxury car distributor such as Jaguar. Accordingly, the Agreement has several provisions concerning dealership facilities. The basic provisions are in Article 4 of the Standard Provisions which provides, among other things, that:

   4.1   Dealer acknowledges and agrees that attractive, well-maintained and conveniently located Dealership Facilities, consistent in design and decor with, and appropriate for the presentation of, luxury automobiles such as the Company's Jaguar Vehicles, are essential to the fulfillment of Dealer's obligations under this Agreement.

   4.2   If Dealer has completed a Company-approved Upgrade Program, Dealer agrees to maintain and enhance its Dealership Facilities in accordance with the Company's reasonable suggestions and increases in the volume of sales and service business conducted by Dealer.

5.  Burke's commitment to maintain appropriate Jaguar facilities was re-affirmed in the 2001 Performance Agreement. Besides agreeing to renovate the 2415 7th Avenue South facility to conform to Jaguar's standards, Burke acknowledged that:

Jaguar's review and approval of the Facility is for the purpose of ensuring that the facility appointments, sales capacity and service capacity are consistent with the brand image of Jaguar and its vehicles. You agree to work with Jaguar and/or its representatives in order to develop a separate, elegant and appropriate atmosphere throughout the Facility for Jaguar. You understand and agree an elegant environment is an important aspect of a dealership and you agree to react in good faith and effort to specific recommendations from Jaguar relating to Jaguar's representation in the Facility. . . .

6. Article 4.4 of the Standard Provisions governs relocation. It requires the dealer to obtain Jaguar's prior written permission before relocating its Jaguar operations. Article 4.4 provides (emphasis added):

> Dealer agrees that it will not relocate all or any part of its Jaguar Operations unless and until it has **first presented to the Company such information as the Company deems necessary to evaluate the proposed new site for such Jaguar Operations and has secured from the Company its prior written consent to such relocation**. Dealer understands that in evaluating any proposed site, the Company will consider various factors, including, but not limited to, the adequacy of the site for a dealership of the size contemplated, the convenience and accessibility of the site to existing and potential Jaguar owners and the type and quality of residential buildings and commercial enterprises located in the general area adjacent to and surrounding the site. The Company will conduct its evaluation of any such proposed site as expeditiously as possible and will use its best efforts to complete such evaluation within thirty (30) days **after it has received all of the information it requires to make such evaluation**. The Company will approve the proposed relocation only if, based upon all the relevant factors, the Company in the exercise of its good faith business judgment considers the proposed relocation to be in the best interest of Dealer and of Jaguar owners in the area in which Dealer is located.

7. Article 14.5(e) of the Standard Provisions provides that the dealer's failure to comply with the relocation approval process of Article 4.4 is grounds for termination of the Agreement:

> The Company and Dealer agree that the following acts are so contrary to the spirit and purpose of this Agreement as to warrant its termination:
>
> \*   \*   \*   \*
>
> (e)   Any change in the location of any of the Dealership Facilities or the establishment of additional facilities without prior consultation with and the prior written approval of the Company, which approval shall not be unreasonably withheld, provided Dealer has fulfilled the terms and conditions of Article 4 hereof . . . .

8. Jaguar's standard practice, when it receives a relocation request under Article 4.4, is to ask the dealer to provide a package of information concerning the proposed relocation site and facility. Jaguar needs to know, among other things, whether the site and the facility will satisfy Jaguar's capacity and design standards. Jaguar needs to know what portions of the facility will be dedicated to Jaguar sales, service and parts operations. Jaguar also needs to know what the dealer plans to do to make the site and facility consistent with the look and feel of a Jaguar dealership.

9. If Jaguar decides to approve the relocation based on the information provided by the dealer, Jaguar's standard practice is to enter into a "performance agreement," which sets forth the agreement between the parties concerning the site and facility to which the dealer will be relocating.

10. Prior to 2009, Burke was familiar with Jaguar's relocation process. The Performance Agreement signed in 2001 had approved Burke's request to relocate its Jaguar operation from 1301 5th Avenue North to 2415 7th Avenue South.

### Burke's Unauthorized Relocation

11. In response to an inquiry from Burke, I advised Burke in writing in December 2009 of the information that Jaguar would need to consider and approve a relocation from 2415 7th Avenue South to 1301 5th Avenue North. Burke, however, failed to provide any of the requested information until July 6, 2010, and even then failed to provide essential information I had requested in December 2009. In violation of Article 4.4, Burke relocated without Jaguar's written consent on or about August 2, 2010.

12. I received a letter dated December 3, 2009, from Burke's owner, Jim Burke, Jr. ("Mr. Burke"), asking JLRNA to approve a relocation of Burke's Jaguar dealership from 2415

7th Ave. South to 1301 5th Avenue North. A copy of Mr. Burke's December 3 letter is annexed hereto as Exhibit A.

13. In his December 3, 2009 letter, Mr. Burke stated that the facility at 1301 5th Avenue North would be shared by Burke's Jaguar and Subaru operations, but that "Jaguar will have its dedicated showroom and Service Entrance, as is currently." I understood Mr. Burke's phrase "as is currently" to refer to the fact that, at the 2415 7th Avenue South location, which Jaguar then shared with Saab, Jaguar had its own exclusive showroom and its own exclusive service entrance. See Performance Agreement, p. 1, second paragraph.

14. No brands other than Jaguar and Subaru were mentioned in Mr. Burke's December 3, 2009 letter as sharing the 1301 5th Avenue North facility. Mr. Burke closed the letter by asking me to advise whether "any additional information" would be needed.

15. I sent a responsive letter to Mr. Burke dated December 10, 2009. In that letter, I listed the information Burke would need to submit for JLRNA to review and approve the relocation request. The requested information included facility plans in a prescribed format, which included specifying the areas of the facility that would be used for each of Burke's Jaguar sales, service, and parts departments and the areas that would be dedicated to Subaru. I also enclosed a checklist of the items needed and a "Jaguar Dealership Guide" that detailed the amount of space needed for each area of Jaguar operations, i.e., Showroom and Sales, Administration, Service Department (including number of flat bays, lift bays, wash bays and alignment bays), Parts Department, parking spaces, etc. A copy of my December 10 letter and attachments thereto is annexed hereto as Exhibit B.

16.     I also pointed out in my December 10, 2009 letter that the proposed relocation site would need to meet Jaguar's current brand image requirements, and I provided a website address where all of those requirements could be found.

17.     Months went by without any response from Burke to my December 10, 2009 letter.

18.     On or about June 8, 2010, JLRNA received by e-mail a one-page, undated letter from Mark Livings, the CEO of Burke, concerning Burke's desire to relocate. The letter made no reference at all to the prior correspondence between Mr. Burke and me in December 2009. Moreover, Mr. Livings' letter did not provide <u>any</u> of the information listed in my December 10, 2009 letter to Burke. Mr. Livings' letter stated in its entirety:

> Please be advised, pursuant to paragraph (4.4) of the Jaguar Dealer Agreement Standard Provisions, of Jim Burke Automotive's intent to relocate, on or before July 1, 2010, its existing Jaguar operations from 2415 7th Avenue South, Birmingham, AL to 1301 5th Avenue North, Birmingham, Al.
>
> Enclosed herewith please find photographs (via email) of the new facility. Let me know if you have any questions. Please provide me with Jaguar Land Rover North America, LLC's approval as soon as possible.

A copy of Mr. Livings' June 2010 letter is annexed hereto as Exhibit C.

19.     I promptly responded to Mr. Livings' letter. By letter dated June 9, 2010, I enclosed a copy of my December 10, 2009 letter to Mr. Burke outlining the information Jaguar needed in connection with the proposal. I pointed out to Mr. Livings that: "To date, JLRNA has not received any of the requested documentation for this relocation request." I also specifically referred Mr. Livings to the paragraph of my December 10 letter concerning Jaguar's current brand image requirements. A copy of my June 9, 2010 letter and the enclosures thereto is annexed hereto as Exhibit D.

20.     I thereafter received a letter from Mr. Livings dated July 6, 2010, which began: "Attached please find the information requested to relocate the Jaguar franchise to our Downtown Location." Attached to the letter was some, but not all, of the information requested in my December 10 letter. A copy of Mr. Livings' July 6, 2010 letter and the attachments thereto is annexed hereto as Exhibit E.

21.     One of the most serious deficiencies in Burke's July 6 submission was that Burke had failed to provide a complete facility plan that specified how the proposed relocation facility was to be divided between Jaguar and Subaru. The material submitted by Burke did not show, for example: (i) how the sales offices and showroom space were to be divided between Jaguar and Subaru; (ii) which parts offices and parts storage space would be dedicated to Jaguar, and which to Subaru; and (iii) which and how many service offices and service bays would be dedicated to Jaguar, and which to Subaru. In short, the submission did not provide the most basic information Jaguar needed to determine whether the proposed facility arrangement would meet Jaguar's space requirements. The submission also failed to address the Jaguar brand image standards.

22.     On July 16, 2010, I sent a responsive letter to Mr. Burke and Mr. Livings. That letter, among other things, advised the dealership that the information provided with its July 6 letter was materially incomplete. After detailing the deficiencies discussed above, the letter advised Burke that: "In order for JLRNA to review your proposed relocation facility, your organization will be required to submit a revised facility plan outlining the aforementioned for review and approval process by JLRNA." The letter also reminded the dealer that "all relocation requests are subject to first securing JLRNA's written approval." A copy of my July 16, 2010 letter and the attachments thereto is annexed hereto as Exhibit F.

23. Burke did not respond to my July 16 letter. Instead, the dealership relocated without Jaguar's approval. According to the Complaint, the relocation took place on or about August 2, 2010.

### Concerns About Current Operation

24. Due to Burke's failure to provide the information requested in my December 10, 2009 letter, Jaguar does not know what dealership operations are currently being conducted at 1301 5th Avenue North.

25. While Mr. Burke's December 3, 2009 letter stated that 1301 5th Avenue North would be shared by Jaguar and Subaru, and that Jaguar would have a "dedicated showroom and Service Entrance," both the signage on the building and Burke's own website indicate that the facility is being shared with Buick, Pontiac, and GMC sales operations, as well as Buick, GM, Chrysler, Dodge, and Hyundai service operations.

26. The accompanying declaration of Thomas Paserchia authenticates photographs taken at 1301 5th Avenue North on August 16, 2010. These photographs show that the facility bears Buick, Pontiac, and GMC sales signage. They also show that the facility has two service entrances: one with signage for "Buick GM Chrysler Dodge Hyundai" and a separate entrance with signage for "Jaguar Subaru." There is no dedicated Jaguar service entrance, as promised in Mr. Burke's December 3, 2009 letter.

27. Burke's website at www.jimburke.com also indicates that Burke continues to conduct Buick and GMC sales operations at 1301 5th Avenue North. I visited the website on August 26, 2010. The website home page bears the logos of both Buick and GMC. When either of those logos is clicked, a box drops down listing the 1301 5th Avenue address and inviting the viewer to "Visit Dealership Site," "Search New Inventory," or "Search Pre-Owned Inventory."

Each of these linked pages lists "1301 5th Ave. N." as the location of "Jim Burke Buick GMC." Annexed hereto as Exhibit G are screen captures taken from the website.

28. In addition, Jaguar does not know whether Burke is conducting Jaguar service and parts business in an appropriate manner. The state-court temporary restraining order dated August 9, 2010 (the "TRO") required Jaguar to continue shipping vehicles and parts to Burke despite its unauthorized relocation. Accordingly, on August 10, 2010, I asked Burke to advise Jaguar where Burke wanted vehicles and parts to be shipped. By letter dated August 10, 2010, Burke responded that it wanted all parts shipped to 1216 3rd Avenue North. (A copy of Burke's August 10, 2010 letter is annexed hereto as Exhibit H.) This is neither the address of Burke's authorized Jaguar location nor of the location to which it has relocated its Jaguar operations.

29. Jaguar would not normally approve of or accept instructions from a dealer to send all parts to a location other than the location where Jaguar service and parts operations are being carried out. The dealer is supposed to have "on site" parts storage so that parts needed for customer repairs are on hand. While Jaguar would not necessarily object to a dealer keeping slow-moving, rarely-used or bulky parts offsite, maintaining the entire parts storage operation offsite is unacceptable.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Cumming, Georgia on August 26, 2010.

_____
Michael Coleman